UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

JEFFREY L. BINKLEY,

          **Plaintiff,**

v.                                                   **Case No. 2:08-CV-617-FtM-29DNF**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

          **Defendant.**
_____/

## OPINION AND ORDER[1]

This matter is before the Court on Plaintiff's complaint (Doc. #1), seeking review of the final decision of the Commissioner of Social Security of the Social Security Administration (the Commissioner) denying his claim for disability and disability insurance benefits (DIB) pursuant to 42 U.S.C. § 405(g) and Supplemental Security Income (SSI)[2]. The Commissioner has filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties have filed legal memoranda. For the reasons set forth below, the Court finds that the Commissioner's decision is due to be **REVERSED AND REMANDED**.

---

[1] Both parties have consented to the exercise of jurisdiction by a magistrate judge, and the case has been referred to the undersigned by an Order of Reference dated October 30, 2008. (Doc. #15).

[2] Because the disability definitions for DIB and SSI benefits are identical, cases under one statute are persuasive as to the other. *Patterson v. Bowen*, 799 F.2d 1455, 1456 n.1 (11th Cir 1986); *McCruter v. Bowen*, 791 F.2d 1544, 1545 n.2 (11th Cir. 1986). Plaintiff is fully insured for disability benefits through December 31, 2010.

## I. SOCIAL SECURITY ACT ELIGIBILITY, THE ALJ'S DECISION AND STANDARD OF REVIEW

A plaintiff is entitled to disability benefits when he is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423 (d) (1)(A); 1382c(a)(3)(A). The Commissioner has established a five-step sequential evaluation process for determining whether a plaintiff is disabled and therefore entitled to benefits. *See* 20 C.F.R. § 416.920(a)-(f); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

On June 22, 2005, the Plaintiff filed an application for disability and disability insurance benefits and supplemental security income alleging an onset date of April 29, 2005. [Tr. 11]. A hearing was held before Administrative Law Judge ("ALJ") Dores D. McDonnell, Sr., in Tampa, Florida. [Tr. 11-19, 503-521]. In his decision dated March 24, 2008, the ALJ denied benefits, finding the Plaintiff not disabled. [Tr. 11-19]. The Plaintiff filed a request for review of the hearing decision and on July 20, 2008, the Appeals Council denied the request for review. [Tr. 6-7]. The ALJ's decision became the final decision of the Commissioner. Therefore, this decision is now ripe for review under the Social Security Act, 42 U.S.C. § 405(g).

The Decision of Administrative Law Judge McDonnell dated March 24, 2008, denied the Plaintiff's claims for disability or disability insurance benefits or supplemental security income. At Step 1 the ALJ found the Plaintiff had not engaged in substantial gainful activity since April 29, 2005, his alleged disability date. At Step 2 the ALJ found that the Plaintiff has the following

severe impairments: coronary artery disease, on Coumadin; overweight; hypothyroidism with history of atrial fibrillation due to thyroid; diabetes mellitus; stable; hypertension, stable; sinusitis; headaches; right rotator cuff tear; gastroesophageal reflux disease (GERD); and chronic low back pain with lumbar and cervical degenerative disc disease . 20 C.F.R. 404.1520 9 ©) and 416.920©). The Plaintiff alleges anxiety and depression and has been prescribed medications but has not been taking them.  The Plaintiff testified that he has memory difficulties and difficulty concentrating. The objective medical evidence shows no significant treatment for depression.  The ALJ found the Plaintiff's mental impairment to not limit the Plaintiff's ability to perform basic work-related activities on a durational basis and,  thus considered it to be "non-severe" as defined in the regulations. [Tr. 14].   The ALJ found that the Plaintiff is capable of performing his past relevant work as a warehouse manager and that this work does not require the performance of work-related activities precluded by the Plaintiff's residual functional capacity ["RFC"] of light. [Tr. 15]. . At Step 3 the ALJ found the Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 4041525 and 404.1526).  At Step 4 the ALJ determined the Plaintiff was able to perform his past relevant work as a warehouse manager and is therefore not disabled. [Tr. 19] . At Step 5  the ALJ considered the Plaintiff's age, education, work experience, and residual functional capacity to determine that the Plaintiff is capable of performing this job as it is generally performed in the national economy.  The Dictionary of Occupational Titles (DOT) shows the Plaintiff's past work to be classified as semi-skilled work of light physical demand. [Tr. 19]

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

## II. REVIEW OF FACTS AND CONCLUSIONS OF LAW

### A. BACKGROUND FACTS:

The Plaintiff was born on July 23, 1956, and was 51 years old at the time of the ALJ's decision. The Plaintiff did not complete high school and dropped out during the 10th grade. The Plaintiff has never obtained his GED. [Tr. 504]. The Plaintiff has past work experience as a

magazine delivery sales person, a warehouse manager, a delivery driver for an auto salvage yard and as a driver for a company that transported cars between auctions for automobile dealers. [Tr. 505-507]. The Plaintiff alleges disability beginning on April 29, 2005. At that time, he was employed as a magazine delivery sales person. [Tr. 505-506]. It should be noted that the Plaintiff was injured on December 18, 2004, while lifting a box of magazines. [Tr. 322, 459]. At that time the Plaintiff was diagnosed with right rotator cuff tear by Brian A. Schofield, M.D.

The Plaintiff suffers from coronary artery disease and is on Coumadin therapy, also hypothyroidism, excessive weight, diabetes mellitus, hypertension, a history of atrial fibrillation (irregular heart beat) secondary to his thyroid condition, sinusitis, chronic headaches, gastroesophageal refllux disease (GERD) chronic low back pain with lumbar and cervical degenerative disc disease and a torn right rotator cuff.

The Plaintiff's medical records begin with the torn rotator cuff. In the Plaintiff's initial Worker's Compensation medical visit, he described both sharp and dull pain in his right shoulder with intermittent neck pain after lifting a box of books while working for Anderson News. [Tr. 459]. The Plaintiff's x-rays were negative but the MRI revealed an intrasubstance partial thickness supraspinatus rotator cuff tear. Dr. Schofield explained the pathophysiology of the problem to the Plaintiff. Dr. Schofield recommended surgery due to the Plaintiff's age and because of the pain he was experiencing. [Tr. 322]. The Plaintiff concurred and it was agreed to "do this in the near future".

The Plaintiff's arm was placed in a sling and he was provided Tylenol and Soma. The Plaintiff was returned to work with the limitations of "[n]o lifting over 10 pounds and no over head reaching." [Tr. 458]. Despite physical therapy and treatment with medication, the Plaintiff

continued to have pain and tenderness around his shoulder. During December 2004 and January 2005, the Plaintiff was allowed to continue to work   On February 15, 2005, the Plaintiff was taken off work until he achieved better pain control. [Tr. 399].

On March 21, 2005, the Plaintiff was seen at Venice Regional Medical Center complaining of a sinus infections, headaches and a 30 pound weight loss since his injury in December 2004. [Tr. 359]. A sinus CT showed no intracranial hemorrhage or intracranial abnormality, but revealed severe paranasal sinus disease in the left maxillary sinus. [Tr. 356].

On March 27, 2005, the Plaintiff was seen at Doctor's Hospital of Sarasota complaining of severe right temporal headache. The Plaintiff advised that the headaches last about 15-20 minutes and he did not have nausea but had tearful eyes and blurry vision. While at the hospital, the Plaintiff underwent a CT scan of his brain which showed "mild inflammation of the ethmoid sinuses, but no active sinusitis or disease". [Tr. 346]. The Plaintiff's MRI was reviewed and showed left sided sinusitis as well as a congenital arachnoid cyst in the middle cranial fossa. The Plaintiff was discharged with a diagnosis of headache and a history of sinusitis. [Tr. 346].

The Plaintiff was seen by Dr. Christopher Jefferson, his treating physician, from July 19, 2005 through April 10, 2006. Dr. Jefferson's records reveal that the Plaintiff was still having problems of hypertension, hypothyroidism, a torn rotator cuff and slight tachycardia. [Tr. 225]. It was specifically noted that the Plaintiff was unable to have his shoulder surgically repaired because of his hypothyroidism which was being treated with Benicar.

On May 26, 2005, the Plaintiff was seen by Dr. Joseph Rand, a board certified endocrinologist for his hypothyroidism. Dr. Rand's physical examination revealed: a large nodule on the thyroid, decreased breath sounds, trace edema in the extremities and anxiety. He found the

Plaintiff's judgment and insight to be questions. In a letter to Dr. Jefferson, he stated that the Plaintiff had hyperthyroidism and a large goiter. He suspected the Plaintiff had Grave's disease for a long time. He mentioned that it appeared the Plaintiff had lost 40 pounds since October of 2004 and that hyperthyroidism can lead to permanent heart and bone problems. [Tr. 375].

On July 8, 2005, the Plaintiff had a radioactive thyroid scan which confirmed his diagnosis of hyperthyroidism. The Plaintiff noted he was having visual problems, difficulty sleeping, a rapid heart rate, weight gain, difficulty swallowing, numbness and tingling of the toes and feet and frequent urination. [Tr. 202]. Dr. Rand found the Soma to be responsible for the Plaintiff's hot flashes and sweats. The Plaintiff had stopped smoking and has a large goiter. Dr. Rand opined that the Plaintiff have radioactive iodine treatment. [Tr. 203].

The Plaintiff was seen by Dr. William J. Corin, a cardiologist on September 15, 2005. Dr. Corin wrote Dr. Jefferson noting that the Plaintiff had a previous cardiac catherization which had been performed by another cardiologist. Although, that cardiologist found luminal irregularities, he found nothing else remarkable. Dr. Corin found no evidence of a prior heart attack and "no evidence of left ventricular dysfunction or heart failure." [Tr. 298]. The Plaintiff's ECG revealed "atrial fibrillation with a ventricular response of 99 beats per minute". Based on these findings, he prescribed Coumadin for the Plaintiff, discontinued his blood pressure medication and wanted the Plaintiff be on cholesterol medicine. The Plaintiff was showing glucose intolerance related to his weight and the Plaintiff was advised to lose weight. [Tr. 298-299].

On October 6, 2005, Violet A. Stone, a non-examining physician reviewed the Plaintiff's medical records and found the Plaintiff had the residual functional capacity to perform light work. [Tr. 286]. The Plaintiff was limited by not being able to reach overhead. [Tr. 288]. On July 28,

2005, Glenn E. Bigsby, III, D.O., a non-examining physician reviewed the Plaintiff's medical records and found the Plaintiff capable of light work, limited by not reaching overhead and should avoid exposure to hazards such as machinery and heights. Dr. Bigsby noted that Plaintiff was having weakness and suffered from emphysema. [Tr. 313-320].

The Plaintiff was seen by Dr. Jefferson on November 1, 2005. Dr. Jefferson wrote that the Plaintiff had soreness in his extremities, was fatigued and tired, had an elevated heart rate and blood pressure. Dr. Jefferson surmised that the Plaintiff had gone into atrial fibrillation and this flare up was related to a radioactive iodine treatment for his hypthyroidism. [Tr. 227].

On November 16,2005, the Plaintiff again indicated to Dr. Rand he was having blurry vision, right sided headaches, angina, shortness of breath, low appetite but weight gain and numbness in the hands and feet. [Tr. 204]. Dr. Rand noted, to wit: "no resting tremor, neck and thyroid appeared normal" and his hyperthyroidism was "clinically stable.". {Tr. 205].

The Plaintiff was seen in December 2005 complaining that the headaches were worse and that the pain medication merely masked them. He complained of problems with neck pain with tingling. The Plaintiff was experiencing anxiety and depressive symptoms including suicidal ideas "without a plan." In the Assessment completed by Dr. Jefferson, he supported the Plaintiff going on disability due to the Plaintiff's pain and the thyroid problems causing tachycardia. [Tr. 228]. The Plaintiff continued on the Prevacid and he was restarted on Coumadin and Lexapro and Konopin for his depression and anxiety.

On January 4, 2006, the Plaintiff complained of blurred visions, headaches and chest pain to Dr. Rand. He noted that Sarasota Memorial Hospital was exploring the possibility of getting the Plaintiff on disability. He noted that Plaintiff had a multi nodular goiter, on the right which was

hard and had not previously been hard. A CI scan indicated that a biopsy might be necessary. [Tr. 207]. Dr. Rand's note of February 4, 2006, stated that the Plaintiff continued to have leg cramps, the goiter was hard and it was necessary to increase his Synthroid. His notes stated that the Plaintiff's Coumadin dosage would vary with his thyroid function. [Tr. 209]. Plaintiff's May visit was marked by complaints of fatigue and shortness of breath. A needle biopsy of the goiter suggested it was benign but was not entirely conclusive. [Tr. 211].

On March 10, 2006, the Plaintiff came in with back pain. He was taking Celebrex and Skelaxin. The Skelaxin made him drowsy although he stated he was not fatigued, depressed, anxious or experiencing trouble sleeping. An MRI was suggested but the Plaintiff deferred due to lack of funds. [Tr. 230]. On May 1, 2006, the Plaintiff did have an MRI of his lumbar spine which revealed, "[D]egenerative changes with moderate stenosis particularly at L4-5". [Tr. 243].

On March 30, 2006, the Plaintiff was seen for medication and back pain on his right side. The Plaintiff complained of pain radiating into his legs; that he was painful to sit; lying down was uncomfortable and the pain was worse in the evening. Upon examination, the Plaintiff had back tenderness and spasm from the neck to the buttocks. However, the Plaintiff showed a good range of motion in his lower legs. The atrial fibrillation, blood pressure and GERD seemed to be under control with medication. [Tr. 229].

The Plaintiff was seen at the Sarasota Health Department (May 23, 2006-May 8, 2007) for regular treatment. His care was supervised by Dr. I Nguyen, M.D. The initial visit on May 23, 2006, revealed hypertension, torn right rotator cuff, hyperthyroid, hyprlipidemia, depression and chronic low back pain. The Plaintiff was taking Inderal, Benicar, Lexapro, Lipitor, Synthroid, Celebrex and Quine Sulfate. [Tr. 159]. An ECG was ordered and a sleep study. When the

Plaintiff returned in June 2006 he was having reduced abduction in his right arm with pain and experiencing chest pain. A cardiac catheterization revealed mild coronary artery disease. [Tr. 160]. On June 23, 2006, the Plaintiff went to the clinic because of visual problems and was referred to an opthamologist and cardiologist. In July 2006, the Plaintiff was still having headaches and was not taking the Coumadin because of having a tooth pulled. [Tr. 162]. In August of 2006, the Plaintiff's Coumadin dosage was changed and he continued with headaches and sinus problems. In October 2006, the Plaintiff developed a sebaceous cyst on the left shoulder. [Tr. 165-167].

In January of 2007 the Plaintiff was being treated at the health department for follow-up regarding his Coumadin therapy. The Plaintiff was also seen for pain in his shoulder and in February again for his right shoulder and back pain. The Plaintiff was given Tylenol for his pain and referred to orthopedics. [Tr. 259].

On March 7, 2007, the Plaintiff went to Sarasota Memorial Hospital Emergency Room for chest pain to rule out coronary artery disease. [Tr. 258]. On March 9, 2007, the Plaintiff followed up with Dr. Nguyen. The chest x-ray and cardiac enzyme test ruled out a heart attack. Notes reflected that the Plaintiff was not sleeping although his depression and cholesterol appeared to be stable.

Treating notes from May 8, 2007, indicate the Plaintiff was taken off Coumadin in preparation for surgery and after surgery, it would be restarted. The Plaintiff's hypertension was listed as stable, controlled with medication and he was placed on Zocor for his high cholesterol, but he was still hypothyroid. [Tr. 254].

On June 7, 2007, the Plaintiff's treatment notes show depression, hypertension, stable; a distended abdomen and torn right rotator cuff. [Tr. 154]. The Plaintiff was seen by Dr. Nguyen on June 27, 2007, for a skin bruise and abrasion he received doing yard work. The Plaintiff's Coumadin dosage was reduced, he was advised to discontinue it until 5 p.m. the next day. [Tr. 150]. The Plaintiff returned two days later and x-rays were taken of both hips and were negative. In August, 2007 the Plaintiff's visit was unremarkable except for sweating and diarrhea. The Plaintiff was diagnosed with a viral infection and continued on his medications.

On September 15, 2007, the Plaintiff was seen for upper respiratory symptoms. At this examination the Plaintiff was discovered to have an irregular heart rhythm which an EKG confirmed to be atrial fibrillation. The Plaintiff also had tenderness over the sciatic notch with the application of pressure producing pain radiating down the leg. The Plaintiff was given Prevacid for his gastroesophageal reflux disease. [Tr. 226].

During his appointments through November of 2007, the Plaintiff had routine follow-ups. It was noted he was losing weight and still experiencing pain in his right shoulder. The Plaintiff was stable on his medications. [Tr. 130, 137].

    B.    **SPECIFIC ISSUES:**

        1.    **THE ALJ'S DISABILITY DETERMINATION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**

The Plaintiff alleges that the ALJ failed to state the weight given to each piece of impairment evidence. The Plaintiff argues the ALJ did not address the Plaintiff's complaints of blurred vision. The Sarasota County Health Department reported no eye abnormalities on the Plaintiff's numerous visits for other complaints. [Tr. 130-31, 133-34, 134A]. Joseph Rand, M.D.

the Plaintiff's treating endocrinologist, reported in November 2005 that the Plaintiff's eye movements were normal and he had no exophthalmos. [Tr. 205]. Christopher Jefferson, M.D., the Plaintiff's treating physician, noted in his April 10, 2006, examination report "[n]o eye trouble." [Tr. 230]. The Plaintiff cites materials on a medical website to support his claim that the ALJ failed to address his visual problems. This material is not sufficient to establish the presence of disabling symptoms under the law.

The ALJ questioned the Plaintiff regarding his vision at the hearing. The Plaintiff responded that he thought he needed glasses. [Tr. 512]. The Plaintiff stated he couldn't afford glasses, but he also acknowledged that he was trying to go through the Sarasota Community Clinic to save on the expense. [Tr. 512]. The record shows that the Plaintiff received on-going treatment from various facilities and doctors. The regulations provide "[w]e will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence ...." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). The ALJ properly evaluated the Plaintiffs alleged visual impairment.

The Plaintiff argues that the ALJ improperly discounted the Plaintiff's shoulder injury. The ALJ found that the Plaintiff's rotator cuff tear was a severe impairment. [Tr. 13, Tr. 447]. The ALJ assessed the Plaintiff could perform only light work and should avoid frequent overhead reaching with the right shoulder. [Tr. 15]. The ALJ determined the Plaintiff had injured his right shoulder in December of 2004. [Tr. 17, 450]. The ALJ acknowledged that after his injury his work status was limited for two months. [Tr. 18, 403-57]. On February 19, 2005, Dr. Schofield performed an orthopedic evaluation. [Tr. 322]. The Plaintiff was in no acute distress, walked`

without difficulty and had "full active range of motion in both shoulders with some pain on extremes of motion on the right; 4/5 strength of forward flexion, abduction and external rotation on the right with pain; and 5/5 extension strength with no pain. Although operative repair was recommended, Dr. Jefferson indicated the Plaintiff's doctors' had postponed the surgery while he received treatment for hypothyroidism. [Tr. 225].

In September 2005, the Plaintiff advised Dr. Jefferson of back tenderness related to sciatica, rather than the rotator cuff condition. In December 2005, again the Plaintiff complained of swelling of the left side of his neck and right leg pain. [Tr. 226]. In March 2006, Dr. Jefferson reported the Plaintiff was complaining of back pain on the right side from the neck to the buttock area on the right. [Tr. 229]. In February of 2007, the Plaintiff was still experiencing chronic right shoulder and back pain and he was referred to an orthopedist. [Tr. 259].

The ALJ found Dr. Jefferson's opinion inconsistent with his own treatment notes in that Dr. Jefferson's "only" physical finding was back pain. [Tr. 18]. Again, the ALJ had concluded that the Plaintiff's shoulder was not serious enough to require surgery, when in fact surgery had been recommended. The ALJ improperly discounted Dr. Jefferson's opinion that the Plaintiff was in pain and disabled. The medical reports of record support the finding that the Plaintiff was in pain and that his treating physicians prescribed various treatments and medications to offer him relief.

In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

-13-

The pain standard requires:

(1) evidence of an underlying medical condition and either

(2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or

(3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. *Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

The ALJ improperly determined that the Plaintiff's medical condition did not cause pain.

The ALJ went on to discount the information that Dr. Jefferson had received from the many specialists he had referred the Plaintiff to for specific medical problems. Dr. Rand had found and treated the Plaintiff's hyperthyroidism. [Tr. 196-223]. Dr. Corin evaluated the Plaintiff's irregular heartbeat and referenced that the Plaintiff had minimal coronary disease. [Tr. 299]. Sarasota Memorial Hospital was attempting to get the Plaintiff on disability. All of this evidence was provided by specialists in the fields of endocrinology, cardiology and orthopedics. [Regulations at 20 C.F.R. §§404.1527(b), 416.927(b) (the regulations provide that in making a disability determination, medical opinions will always be considered][3]. The ALJ failed to reference in his decision any of the specialists or their opinions.

### 2. THE ALJ ERRED IN FINDING THE PLAINTIFF COULD RETURN TO HIS PAST RELEVANT WORK

---

[3] 20 C.F.R. §§404.1527(d)(5), 416.927(d)(5) state that greater weight is given to the opinion of a specialist about medical issues related to the doctor's area of speciality than to the opinion of a doctor or source that is not a specialist.

The Plaintiff contends the ALJ erred in finding the Plaintiff capable of performing his past relevant work as a warehouse manager. The ALJ found that this job does not require the performance of work related activities precluded by the Plaintiff's residual functional capacity. 20 C.F.R. 404.1565 and 416.965).

The ALJ properly found the Plaintiff's work as a warehouse manager was past relevant work but failed to develop the functions required by warehouse manager as it is generally performed. The ALJ's analysis:

> In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as generally performed. The Dictionary of Occupational Titles (DOT) shows claimant's past work as a warehouse manager is classified as semi-skilled work of light physical demand. [Tr. 19].

The Plaintiff wrote in his application for benefits that he had worked at a plumbing supply company as a driver, warehouse manager from August 1999 until May 2004. The Plaintiff described his duties as "receive freight, pull orders, drive forklift and trucks, help load and unload trucks." [Tr. 68]. The Plaintiff wrote in his disability report that he "used machines, wrote reports, supervised 5 to 7 other persons", but that he was not a lead worker. With respect to the exertional and postural activities, he wrote that "he stood and walked 6 hours a day, sat for 1 hour and did not engage in any climbing or crawling. He stooped 5 hours, crouched 2 hours, handled, grabbed or grasped big objects 6 hours, reached 6 hours, and wrote, typed or handled small objects about 1 hour a day." The heaviest item he lifted was 600 pounds and he frequently lifted items weighing 140 pounds. He described these as plumbing items, to-wit: bathtubs, water heaters and pipes. [Tr. 97]. At the hearing, the Plaintiff testified he had worked as a warehouse manager for 5 years, yet

the ALJ never questioned the Plaintiff about his past relevant work. Therefore, it is unclear whether the Plaintiff was a "driver" or "warehouse manager" or whether he performed both jobs for the company or did them at separate times or whether it was a "blended" job.

At the hearing the Plaintiff testified that he had worked as a warehouse manager for 5 years. [Tr. 506]. The Plaintiff argues that warehouse manager would be classified as heavy work and his duties would be incompatible with the Plaintiff's RFC considering the lifting and reaching requirements and the necessity to avoid exposure to hazards such as machinery. [Tr. 15]. The only evidence as to how a warehouse manager's job is performed in the national economy is the ALJ's statement as noted above. There is no vocational expert testimony confirming this classification.

The DOT lists only five (5) light jobs with the same or similar titles as "warehouse manager", to-wit: 1) Manager, Warehouse; 2) Operations Manager; 3) Manager, Tobacco Warehouse; 4) Manager, Service Department; and 5) Stock Supervisor. Although these managerial jobs are light, they are skilled with SVP's of 6 through 8, meaning that they are not semi-skilled, as defined by the ALJ.

A vocational expert would have provided the necessary information regarding the claimant's past relevant work and made the determination of the claimant's acquired skills and it they were transferable. The ALJ's analysis of the claimant's past relevant work is not consistent with the DOT. Therefore, the ALJ's decision is not based on substantial evidence. The Plaintiff may have been found disabled pursuant to the medical-vocational guidelines. Additionally, the vocational expert would have taken into account the Plaintiff's age and limited education.

### III. CONCLUSION

There is a reasonable possibility that a proper analysis of the Plaintiff's exertional and non exertional impairments would change the administrative results.

It is hereby **ORDERED** that the decision of the Commissioner be **REVERSED** and **REMANDED** pursuant to 42 U.S.C. § 405 (g) to allow the Administrative Judge to:

(1) Hold a supplemental hearing to reconsider the Plaintiff's claims in light of the findings of the physicians and medical experts who treated the Plaintiff and to take additional evidence relevant to the Plaintiff's impairments and make new findings.

(2) Conduct a hearing to consult with and elicit testimony from a vocational expert to properly consider the limitations, if any, of the Plaintiff performing light work on a regular and sustained basis.

(3) Determine the availability of suitable jobs in the local and national economy based on all of the Plaintiff's impairments.

(2) The Clerk is directed to enter judgment accordingly and close the file.

**DONE and ENTERED** in Chambers at Fort Myers, Florida, this 30th day of July day of 2009.

_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to:
All Counsel of Record